1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3
      UNITED STATES OF AMERICA,
4
                          Plaintiff,
5     vs.                                 Case No. 21-20665
                                          Hon. Terrence G. Berg
6     D-2 SAMANTHA GILLIAM,

7                          Defendant.
      _____/
8
                             **SENTENCING**
9
               BEFORE THE HONORABLE TERRENCE G. BERG
10                    United States District Judge
               Theodore Levin United States Courthouse
11                    231 West Lafayette Boulevard
                       Detroit, Michigan  48226
12                  Thursday, November 21, 2024

13    APPEARANCES:

14    For the Plaintiff          TARA HINDELANG
      United States of America:  SARA D. WOODWARD
15                               U.S. Attorney's Office
                                 211 W. Fort Street
16                               Suite 2001
                                 Detroit, Michigan 48226
17                               313-410-5177

18    Also Present:             JESSICA SUMYK, Special Agent, FBI

19
      For the Defendant          MARIA P. MANNARINO
20    D-2 Samantha Gilliam:      Maria Mannarino PC
                                 500 Griswold
21                               Suite 2450
                                 Detroit, Michigan 48226
22                               248-761-7347

23
          To obtain a certified copy of this transcript, contact:
24          Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
                        Official Court Reporter
25             (313) 234-2616 • www.transcriptorders.com

## TABLE OF CONTENTS

Page

SENTENCING:

Introductory Comments by the Court...................4
Allocution by Ms. Mannarino.........................12
Allocution by Defendant Gilliam.....................16
Allocution by Ms. Hindelang.........................17
Allocution by Adult Victim 4........................23
Further Comments by the Court.......................25
Sentence of the Court...............................34

EXHIBITS

Identification                    Offered    Received

NONE

| | |
|---|---|
| 1 | Detroit, Michigan |
| 2 | Thursday, November 21, 2024 |
| 3 | —  —  — |
| 4 | (Proceedings commenced at 11:10 a.m., all parties |
| 5 | present) |
| 6 | THE CLERK:  All rise.  United States District Court |
| 7 | for the Eastern District of Michigan is now in session, the |
| 8 | Honorable Terrence G. Berg presiding.  Please be seated. |
| 9 | Calling the Criminal Action No. 21-cr-20665-2, United |
| 10 | States of America versus Samantha Christine Gilliam. |
| 11 | Counsel, please place your appearances on the record. |
| 12 | MS. HINDELANG:  Good morning, Your Honor.  Tara |
| 13 | Hindelang on behalf of the United States. |
| 14 | MS. WOODWARD:  And Sara Woodward on behalf of the |
| 15 | United States, and with us at counsel table is Special Agent |
| 16 | Jessica Sumyk with the FBI. |
| 17 | THE COURT:  Good morning, Counsel. |
| 18 | MS. MANNARINO:  And good afternoon.  Mario Mannarino |
| 19 | on behalf of Ms. Samantha Gilliam who's present and stands to |
| 20 | my left.  Why don't you go ahead and identify yourself for the |
| 21 | record. |
| 22 | DEFENDANT GILLIAM:  Samantha Gilliam. |
| 23 | THE COURT:  And good morning to you, Ms. Mannarino, |
| 24 | and good morning, Ms. Gilliam. |
| 25 | DEFENDANT GILLIAM:  Good morning. |

| 1 | MS. MANNARINO:  Judge, your door is open and it's |
|---|---|

 1      MS. MANNARINO:  Judge, your door is open and it's

 2  casting a light that makes it hard for me to see you.

 3      THE COURT:  Oh, thank you.

 4      (Brief pause)

 5      MS. MANNARINO:  Thank you.

 6      THE COURT:  You may be seated.

 7      So this morning we have set aside time for a

 8  sentencing hearing in this case and I want to explain what's

 9  going to happen.  So Ms. Gilliam, we're going to have a hearing

10  to determine what your sentence should be in this case, and as

11  part of that we'll go over a number of different steps.

12      We'll go over what it is that you were convicted of.

13      We'll ask you whether or not you had a chance to read

14  the Presentence Report and go over that with your lawyer and

15  see if there are any objections to it.

16      I'll make sure you understand what the federal

17  sentencing guidelines are that apply to your case and what

18  those guidelines say with respect to the range of sentence that

19  would apply.

20      I'm also going to go over with you what the different

21  factors are that the Court must consider in determining what

22  the sentence should be.

23      I will give your attorney the opportunity to address

24  the Court in terms of arguing what would be an appropriate

25  sentence.  I'm also going to give you the opportunity to say

| | |
|---|---|
| 1 | whatever you would like to say on your own behalf.  I'll turn |
| 2 | to the government and give the government the opportunity to |
| 3 | address the Court as well in terms of what they believe the |
| 4 | appropriate sentence should be. |
| 5 | After that, I'll go over all those different factors |
| 6 | that I have to consider and I'll explain how they relate to the |
| 7 | case and then I will indicate what the sentence will be. |
| 8 | Do you think you understand what's going to happen? |
| 9 | DEFENDANT GILLIAM:  Yes, Your Honor. |
| 10 | THE COURT:  All right.  So first of all, let's start |
| 11 | off with your Presentence Report.  And the Presentence Report |
| 12 | does indicate in it what it was that you pled guilty to, and so |
| 13 | you pled guilty to Count 1, which was conspiracy to engage in |
| 14 | sex trafficking, and then Count 10, which was maintaining a |
| 15 | drug premises. |
| 16 | Ms. Mannarino, did you go over that Presentence |
| 17 | Report and do you have any objections or changes to it? |
| 18 | MS. MANNARINO:  We have gone through the -- we have |
| 19 | received a copy, we've gone through it together.  I don't -- |
| 20 | other than I think some concerns I had that I addressed, I have |
| 21 | nothing further, we have no additions or corrections to the |
| 22 | report. |
| 23 | THE COURT:  All right.  Thank you. |
| 24 | And Ms. Gilliam, did you go over that report with |
| 25 | your attorney? |

1          DEFENDANT GILLIAM:  Yes, Your Honor.

2          THE COURT:  Did you see anything in there that was

3    inaccurate or needed to be changed?

4          DEFENDANT GILLIAM:  No, Your Honor.

5          THE COURT:  How about for the government, did you go

6    over it as well?

7          MS. HINDELANG:  Yes, I have, Your Honor.

8          THE COURT:  Were there any changes or corrections you

9    wished to bring to my attention?

10          MS. HINDELANG:  No, thank you.

11          THE COURT:  All right.  So I've reviewed it as well.

12          And as I mentioned before, there was a Rule 11 Plea

13    Agreement in this case, and the Plea Agreement between the

14    parties indicated, of course, that Ms. Gilliam would plead

15    guilty to these charges that we just talked about.  It did not

16    have any specific guideline range as part of it, but it was I

17    believe contemplated that the sentence would be no greater than

18    the low end of that range, is that correct?

19          MS. HINDELANG:  Yes, Your Honor.

20          THE COURT:  And I know from reading the briefing that

21    the parties included here -- and I will say also for the record

22    that both Ms. Mannarino on behalf of Ms. Gilliam and the

23    Assistant U.S. Attorney on behalf of the government submitted

24    detailed sentencing memoranda to the Court that discussed the

25    factors that I have to consider and also the sentencing

1    guidelines, and the parties had indicated that they believed or

2    had estimated that the sentencing guidelines would be between

3    108 and 135 months, but the calculation of those sentencing

4    guidelines in the Presentence Report is higher than that

5    because of the way that the guidelines treat cases like this

6    where there are more than one victim.

7        And the guidelines that the Probation Department

8    calculated were, again, 168 and 210 months, so that's

9    considerably higher.  I can explain why that is.  So although

10   there are two counts, the one count for the conspiracy to

11   commit the sex trafficking, and that count has a high offense

12   level for it which is 34, the guidelines do provide in Section

13   2G1.1(d)(1) that you are to treat a count like this where

14   victims are involved as a separate count for each of those

15   victims even if there's only one count that is charged, and in

16   this case there were five separate identified adult victims

17   that were part of the case.  And so the way the guidelines

18   work, you would treat this as if there were five separate

19   counts with that base offense level of 34.

20       When you do that, the guidelines also provide under

21   the multiple-count analysis that a certain number of units are

22   assigned for each separate count.  In this case the number of

23   units were such that there would be four additional points that

24   were added to the 34 base offense level.  That's because of the

25   fact that you had those five victims.  When you add those four

1    additional points, you come to an offense level of 38.

2            From that 38, three points were taken away because

3    Ms. Gilliam did admit her involvement, she accepted

4    responsibility, so she received both a two-point and another

5    one-point reduction for that, which resulted in an adjusted

6    offense level of 35 and a criminal history category of I, and

7    that is how the Probation Department calculated that guideline

8    range of between 168 and 210 months.

9            In my view of this Presentence Report and their

10   reference to the sentencing guidelines, it appears to me that

11   that calculation of the guidelines is correct.  It is higher

12   perhaps than what the parties anticipated at the time of the

13   plea, but the Plea Agreement itself does not contain any

14   calculation of the guidelines and specifically indicated in the

15   Plea Agreement that the Court would determine the guideline

16   range at the time of sentencing.

17           And so I do determine that the proper guideline range

18   is what is reflected in the Presentence Report.  And so I did

19   want to make sure that the parties still wanted me to accept

20   the Plea Agreement that was entered into at the time of the

21   plea, understanding that I am calculating the guidelines higher

22   than perhaps they anticipated at the time even if it wasn't in

23   the Plea Agreement.

24           I do want to say, and I'm sure that both sides know

25   this, but the Court is not required to sentence a person within

1    that guideline range.  The guideline range is advisory rather

2    than mandatory.  In other words, the Court has the discretion

3    or the power to sentence below that guideline range if it

4    wanted to.  In this case if I accepted the Plea Agreement, I

5    could not sentence higher than the low end of the guideline

6    range because the parties did include that in the Plea

7    Agreement.

8             And so Ms. Mannarino, do you still want me to accept

9    the Plea Agreement that was entered into at the time of the

10   guilty plea hearing?

11            (Brief pause)

12            MS. MANNARINO:  Thank you, Judge.

13            I have discussed that with Ms. Gilliam.  Ms. Gilliam

14   wants to go forward.

15            THE COURT:  Thank you, Ms. Mannarino.

16            And Ms. Gilliam, you heard what I said as well.  Is

17   that correct?

18            DEFENDANT GILLIAM:  Yes.

19            THE COURT:  And what about the government, do you

20   want me to accept this Plea Agreement as well?

21            MS. HINDELANG:  Yes, Your Honor.

22            THE COURT:  Then I will accept the Plea Agreement

23   that was entered into at the time of the guilty plea, and I

24   would be governed by the terms of that Plea Agreement in

25   determining the sentence.

1          So I also wanted to go over, as I said I would, the

2     different factors the Court has to consider in addition to

3     those guidelines.  Under a federal statute that governs all

4     sentencings, the Court is required to consider the nature and

5     circumstances of the offense, all of the surrounding

6     circumstances regarding the crime.

7          I also have to consider the history and

8     characteristics of the individual defendant.  That means I have

9     to consider your background, your history, Ms. Gilliam, not

10    only if you had any prior criminal history, which you don't

11    have any major criminal history other than some traffic-related

12    offenses, but I have to consider everything about your

13    background such as your family, your upbringing, your

14    employment, your education, your current family situation, your

15    health, if you have any drug problems or mental health

16    problems, I have to take all of that into account.

17         I also have to consider certain goals of sentencing

18    such as the goal of imposing a sentence that reflects the

19    seriousness of the offense, promotes respect for law, provides

20    for a just punishment, affords what we call adequate

21    deterrence, and deterrence means discouraging people from

22    committing such crimes.

23         Also protecting the public from such crimes as

24    another goal of sentencing.

25         I also have to consider any specialized treatment

1    that a person may need such as medical treatment or training,

2    vocational training or other correctional treatment.

3            I have to consider those sentencing guidelines that

4    we already mentioned.

5            I also have to try to avoid what we call unwarranted

6    sentencing disparities, and that means we try to avoid

7    sentencing people differently if their underlying crimes and

8    their backgrounds are similar.

9            I also have to consider the need for restitution if

10   that applies.

11           And I have to try to come up with a sentence that is

12   sufficient but not greater than necessary to accomplish all

13   these different goals.  Do you understand, Ms. Gilliam, that I

14   do have to consider all these different things?

15           DEFENDANT GILLIAM:  Yes, Your Honor.

16           THE COURT:  What I'd like to do then now is to turn

17   to the attorneys and give them an opportunity to address the

18   Court, and as I said, Ms. Gilliam, I'll give you the

19   opportunity as well.  So we'll start with Ms. Mannarino.

20           MS. MANNARINO:  Thank you, Judge.

21           THE COURT:  And you can come up to the lectern if you

22   would like, that might be easier, or if you wish to stay there,

23   you can, but just speak into the microphone.

24           MS. MANNARINO:  I will come up to the lectern.  Thank

25   you.  Thank you.

1        So I just want to start out by saying I know the
2   Court is aware that sometimes these cases go on for quite some
3   time, and I -- you know, and I just want to say to the Court
4   Ms. Gilliam and I have now been together for a number of years.
5   We first met, oh, over three years ago, and I just want to say
6   that during that course of time I have seen such a dramatic
7   change in her.
8        First of all, I just want to acknowledge she has a
9   lot of support and many of those people are here.  Her children
10  are here, her friends are here, her sister is here.  She has a
11  lot of support, people who love and care about her, and I just
12  want to thank them for coming and acknowledge them being here
13  in support of Ms. Gilliam.
14       The -- during the course of this case not only have I
15  seen a dramatic change in Ms. Gilliam, but we've been through a
16  number of things.  She's had, I'm sure the Court is aware or
17  may recall, a number of health issues.  She was diagnosed with
18  cancer.  She's been through surgery and chemo and treatment,
19  and there are some ongoing medical issues that she's also
20  dealing with.  So -- and I have seen her progress in therapy.
21       She has, you know -- because ultimately the question
22  is, how does she find herself here, this accomplished, smart,
23  hard-working woman with a lot of support in the community, how
24  does she find herself here in this position?  What caused her
25  to make the choices she made that -- that brings her before the

1    Court?

2         And she's had the opportunity to have now been in

3    therapy for a number of years, and I think there's some

4    indication in the reports the -- the Court has received that

5    she's made tremendous progress.  She has made, you know -- had

6    some tremendous breakthrough in coming to deal with her past,

7    as the Court I think saw in the materials we submitted, a

8    horrific childhood; victim of, you know, poverty, sexual abuse,

9    physical abuse, a number of issues that she has had to

10   overcome.

11        And she thought she was doing pretty well, right?  I

12   mean she's working, she has a good job, she owns her own home,

13   she has a lot of support.  But what caused her, as the

14   prosecutor said in their sentencing memo, to turn a blind eye

15   to what was going on?  And I think her years now in therapy

16   have been productive, have allowed her to address some of those

17   generational trauma that -- that led to some of the decisions

18   she made in -- in a hope, quite frankly, that she can make sure

19   that generational curse is -- is broken for her daughters, not

20   only her biological daughter but she has a ward that she has

21   taken custody of and supports, and I think the -- the Court has

22   seen the letters that she brought this morning in support.

23        THE COURT:  I did receive those letters, thank you,

24   and I read them as well.

25        MS. MANNARINO:  So her years now in therapy I think

1    have caused some great breakthroughs for her to address not

2    only her own issues, what would cause her to turn a blind eye

3    to somebody like Mr. Summerlin, who, by all accounts, we know

4    he took advantage of vulnerable women, I mean that's the whole

5    basis of the -- of the charges, but I can't ignore the fact

6    that he also took advantage of a very vulnerable Samantha

7    Gilliam who --

8         THE COURT:  When you speak of treatment, I did not

9    recall a lot of reference to treatment in the Presentence

10   Report.  Was this something more recently or...

11        MS. MANNARINO:  She has been in treatment since the

12   inception of this case, and I -- I -- in fact, I think the --

13   the Pretrial Service --

14        THE COURT:  It says she has participated in

15   co-occurring services with Shanle Psychological Services and

16   that's -- that is definitely in there.  Is that -- is that

17   mainly what you're referring to?

18        MS. MANNARINO:  Yes, she has been consistently

19   participating for quite some time now.  And I -- I believe, by

20   all reports, she's been an active participant, making great

21   progress and addressing some of that generational curse that --

22   that she, you know -- that burden that she was given to carry.

23        So -- and I think -- and -- you know, and I just want

24   to re-reiterate, I know the prosecutor has submitted some

25   letters from -- some statements from the victims, and I think

1    what's instructive in there is their recognition of, you know,

2    what caused her to turn a blind eye, her being Ms. Gilliam, to

3    turn a blind eye to what was going on, and, you know, that is,

4    in fact, what Ms. Gilliam has been addressing.

5            The reports also indicate that one of the things that

6    they are concerned about is that there was some indication that

7    Mr. Summerlin wanted to continue contact with Ms. Gilliam and

8    that Ms. Gilliam was open to that idea.  I think that was

9    something that -- that she said early on in these proceedings.

10   Since she's been in therapy, I think she has recognized that

11   any further contact with Summerlin would be absolutely

12   inappropriate, counterproductive.  She has no interest in

13   having any continued contact with, you know, the man who took

14   advantage of her and, quite frankly, brought her to this

15   position.

16           So Ms. Gilliam is a -- is a woman who has been

17   consistently employed, has a family that loves her and she is

18   very close to.  And so, you know, the question then, what is an

19   appropriate sentence for somebody like Ms. Gilliam?  And we

20   know and we are -- you know, we know the guidelines came back

21   higher than we had anticipated, and I -- you know, I think I

22   already placed my objections to the -- to the calculation of

23   those guidelines.

24           But regardless of the guidelines, obviously what

25   we're asking for is a sentence substantially below the

1    guidelines.  Quite frankly, I don't know that a custodial

2    sentence is necessarily appropriate under the circumstances.

3    She certainly is not a danger to the community.  She's

4    certainly not somebody who's likely to reoffend.

5           And so what does justice demand in terms of a

6    sentence for -- for Ms. Gilliam?  I think that during the past

7    three-plus years that this case is pending, I think she has

8    already shown the Court that she is willing and capable of

9    making the changes necessary to make sure this never happens

10   again, that she never falls victim to something like this

11   again.  I think that -- that she has already indicated and

12   shown the Court that she can be a productive member of society

13   and that a lengthy custodial sentence is not necessarily called

14   for under the circumstances of this case.

15          THE COURT:  All right.  Thank you very much --

16          MS. MANNARINO:  Thank you.

17          THE COURT:  -- Ms. Mannarino.

18          All right.  So Ms. Gilliam, this is your opportunity

19   to say whatever you would like to say on your own behalf.  I

20   would be happy to hear from you.

21          DEFENDANT GILLIAM:  I would like to apologize for any

22   involvement.  I have never been in trouble in my life other

23   than some speeding tickets or a traffic ticket.  I'm a good

24   mom.  I've never thought that my life or this would be any part

25   of my life, Your Honor.  I'm a good person.  I get up and go to

1    work every day.  I provide for my children the best way I know

2    how by going to work every day.  I try my best to be a good mom

3    and a good role model to the girls that are in my life.  I

4    don't want my kids to ever experience the things that I've

5    experienced in life so I keep a tight hold on my kids.

6              I don't feel like or think that I should spend a

7    lengthy time in jail because I want to protect my daughter.

8    It's hard out here in this world, especially for little girls.

9    My daughter is a straight-A student.  She's been accepted to

10   five colleges, universities.  She's a good girl and I want to

11   keep her that way, Your Honor.  That's it.

12             THE COURT:  All right.  Thank you very much, Ms.

13   Gilliam.

14             Now it's the government's opportunity to address the

15   Court, and so who would like to address the Court on behalf of

16   the government?

17             MS. HINDELANG:  I will, Your Honor.

18             THE COURT:  All right.  Ms. Hindelang, go ahead.

19             MS. HINDELANG:  And, Your Honor, is it okay if I stay

20   at the table?

21             THE COURT:  You may.

22             MS. HINDELANG:  I'll make sure I keep my voice up and

23   slow.

24             Your Honor, there are victims in this case.  Your

25   Honor has received impact statements from those victims.  To be

1   sure though, Ms. Gilliam is not one of the victims.  There is

2   no evidence that she was abused or forced to participate in Mr.

3   Summerlin's activities in exploiting vulnerable women.

4       Ms. Mannarino quoted something from our sentencing

5   memo but not the whole thing.  What I said in the sentencing

6   memo was, "At best, Gilliam turned a blind eye towards

7   Summerlin's occasional use of violence and sexual assault to

8   ensure his victims' compliance.  At worst, she was a

9   participant and co-conspirator."

10      Ms. Gilliam used her success in life to help Mr.

11  Summerlin accomplish his goals.  She gave him a home that was

12  away from -- away from where people would think that this type

13  of activity was happening.  She used that home to further

14  isolate the victims so that they could not seek help and it

15  would not be as easy for them to escape.  And she did this all

16  under the same roof where her children were living.

17      She knew what Mr. Summerlin was doing and she

18  participated in it.  Many victims reported that if Mr.

19  Summerlin was not at home after they were to perform the

20  commercial sex dates, they were to give the money to Ms.

21  Gilliam.  This was happening in Ms. Gilliam's basement in the

22  home where her children resided.  She interacted with these

23  women.

24      One woman overdosed in Ms. Gilliam's basement, and

25  Ms. Gilliam went downstairs with Mr. Summerlin as she was

1    revived by another victim in her basement.

2           One time when the police were called to the residence

3    after a victim was able to escape, Ms. Gilliam lied to the

4    police about what happened to cover up for what was happening

5    in her house.

6           She allowed for the sale of dangerous drugs and the

7    distribution of dangerous drugs to occur under the same roof

8    where her children were living.

9           The day that the search warrant was executed, law

10   enforcement found evidence of narcotics on a plate just as

11   nearly across the board victims reported that that's how Mr.

12   Summerlin would serve them, with their drugs on a plate.  That

13   plate was found in Ms. Gilliam's daughter's bedroom.

14          Her words that I -- I -- I totally agree that it's

15   hard out here in this world, especially for little girls.  Ms.

16   Gilliam did nothing to help her daughter, to keep her from the

17   dangers that she readily exposed her to, not to mention helping

18   the other women who Mr. Summerlin was victimizing and Ms.

19   Gilliam went right along with and helped too.  All of those

20   women are somebody's daughter, somebody's friend, somebody's

21   sister who had experienced trauma in their own lives, and Ms.

22   Gilliam exploited that trauma so that she could earn money with

23   Mr. Summerlin and line their own pockets.  Ms. Gilliam is not a

24   victim of Mr. Summerlin.  Ms. Gilliam knew what she was doing.

25   She continued her actions, she supported Mr. Summerlin.

1          And the statement that she has changed also rings

2     hollow because in the PSR, in paragraph 96 -- the PSR was filed

3     on November 13th of this year -- Ms. Gilliam reports that she's

4     still open to the possibility of getting back together and

5     cohabitating with Mr. Summerlin.

6          There is absolutely nothing to suggest that Ms.

7     Gilliam has changed or recognizes the wrongfulness of her

8     actions and the damage that she has done to multiple victims

9     and the trauma that they will live with for the rest of their

10    lives because of what she did and what she helped Mr. Summerlin

11    do.  She even said I believe at the time of the plea that she

12    still wanted to have contact with Mr. Summerlin.  She also

13    helped him after he was initially arrested to try to intimidate

14    victims and intimidate witnesses so they would not testify

15    against him.

16          This is not a situation where an abused woman is now

17    in a place of safety, does not have to worry about her abuser

18    anymore and is able to be free from his threats.  Ms. Gilliam

19    is -- is all of those things.  She is free.  She does not have

20    to participate in anything that Mr. Summerlin is requesting her

21    to do.  She does it voluntarily because she wants to.  Mr.

22    Summerlin has been away from her for years now.  She has had

23    the opportunity to move on, to heal, to -- to take

24    responsibility for what she has done, and she still chooses to

25    go back to him.  She does not recognize, she does not

1    understand the unlawfulness of her activity and she doesn't

2    regret it.

3         I would ask the Court to look to and listen to the

4    victims of Ms. Gilliam's offenses, cases where defendants plead

5    and the entire time the Court is faced with just looking at the

6    defendant.  It's difficult because victims rarely get a chance

7    to let their voice be heard in court in these types of cases.

8    And so I would really ask that the Court listen to the

9    letter -- listen to the words and read the words in the letters

10   that the government forwarded.

11        With the Court's permission, I'm going to read one of

12   them now, possibly two.  And there is a victim present who

13   would also like to read her statement and that's how the

14   government would like to conclude.

15        THE COURT:  Maybe you can identify not necessarily --

16   obviously the name, but the -- they're identified as victim --

17   adult victim and then a number, so if you could identify that

18   when you read it, go ahead.

19        MS. HINDELANG:  Thank you, Your Honor.

20        This -- this statement was submitted by just an adult

21   victim.  She is not identified in the indictment but is a

22   victim of the offense.  "I've spent the better part of several

23   weeks racking my brain trying to figure out what to say that

24   might allow whoever is listening to gain some perspective on

25   the trauma that was forced on me.  Then I decided I'd just

1    speak from my heart and not my pain.

2          "I do not understand how anyone could stand by, fully

3    supportive of a man who forced women to just deal with the

4    things that I and several others went through, just to line

5    your pockets.  I avoided dealing with the pain, the trauma for

6    a very long time.  I made terrible decisions to mask the

7    flashbacks I deal with every time I close my eyes.

8          "Since finally opening up, I took away any power I

9    allowed this trauma to have over me.  I have been given the

10   chance to heal and share with other women that there's real

11   hope in healing instead of continuing down a path of

12   destruction.

13         "I truly pray that justice is served and that you are

14   given the chance behind bars to deal with whatever may have

15   caused you to freely and knowingly make the decisions you made,

16   the choices that caused more pain and trauma for me and women

17   like me who didn't ask for this.

18         "I believe that if Samantha is let off without

19   significant time behind bars, she will seek no help and will

20   most likely choose this life for herself again.  I pray that

21   whoever is in charge of her sentencing sees that justice for me

22   means time forced to look at her choices, classes and

23   counseling to hopefully rehabilitate her so that when she's

24   released back into society, she will not make the same

25   decisions she made previously.  It took a lot of healing inside

1  for me to be honest and wish for rehabilitation instead of

2  hateful, angry, harsh punishment simply due to hurt and anger."

3          And it's signed "A survivor of your life choices."

4          I attached and filed under seal to the government's

5  sentencing memo an impact statement from AV-2.  I don't -- I'm

6  sure that the Court has had the opportunity to read it and I

7  quoted that in my sentencing memo.

8          I -- there's also an impact statement from Adult

9  Victim 4.  With the Court's permission, I would ask that she be

10  allowed to come up and read her statement.

11          THE COURT:  Yes, of course.

12          ADULT VICTIM 4:  Good afternoon.  Dear Honorable --

13  Dear Honorable Berg, I stand before you today as someone who

14  has been deeply affected by the actions of Samantha who played

15  a significant role in that human trafficking ordeal and sexual

16  exploitation.  The pain, degradation and trauma inflicted --

17  inflicted upon me was not solely at the hands of Mr. Summerlin.

18  Samantha was very much a partner with him, creating,

19  contributing, maintaining, supporting the fear, physical and

20  emotional abuse inflicted upon me.  She certainly was not an

21  innocent bystander who wasn't aware of what was going on in the

22  home she shared with him.

23          Her actions aided in my suffering, and I cannot

24  express -- I cannot express how much of a major role she played

25  in luring me -- me -- luring me and other victims into human

1    trafficking, leaving forever emotional and physical scars.

2    While some of my physical scars have healed, I'm so afraid my

3    psychological scars may never heal.  They are -- they are a

4    constant reminder of what I've experienced.  Some nights I cry

5    myself to sleep haunted by the memories of being treated as

6    less than a human, less than human.  The fear that I'll be

7    trafficked again is a fear I can't -- I can't escape, an

8    ever-present shadow that disrupts my silence -- disrupts my

9    sense of safety and peace.

10           I believe it is crucial for you to consider the role

11   Samantha played in this crime.  She was not just a passive

12   bystander.  She actively participated and profited from the

13   suffering I endured daily.  It is my hope that the -- it is my

14   hope that the Court understands the severity of her actions and

15   the lasting impact they have had on my life.  I strongly feel

16   she deserves more than just probation.  She must face jail time

17   for the role she played in my trauma and -- and other victims'

18   trauma.  I implore you to recognize that her actions were just

19   as det -- det -- det -- detrimental as those of my trafficker.

20   I fear that without appropriate consequences she may continue

21   to operate without accountability, which terrifies me and

22   others I am sure who have suffered in silence.

23           THE COURT:  Thank you very much.

24           MS. HINDELANG:  Your Honor, before I sit down, I also

25   wanted to just clarify, the Plea Agreement in this case, it's a

1    recommendation, it doesn't limit the Court's sentence.  The

2    Plea Agreement just requires that the government recommend the

3    bottom end of the guidelines.  And I am asking, I asked in the

4    sentencing memo and I am asking that this Court impose a

5    sentence of 108 months, which is well below the bottom of the

6    guidelines that the Court announced on the record today but is

7    the bottom of the guidelines that the parties anticipated at

8    the time the entry -- of the entry of the plea.  And so because

9    the 3553(a) factors so require, the government asks that the

10   Court impose a sentence of 108 months because that is a

11   sentence that is sufficient but not greater than necessary to

12   achieve those sentencing purposes.  Thank you.

13            THE COURT:  All right.  Thank you very much.

14            So I do have to go over those different factors that

15   I mentioned previously, and so I have to begin with the -- the

16   nature and circumstances of the offense here.  The offense here

17   is a very serious crime.  It should not be minimized in any

18   way.  It involves harming other people who were vulnerable

19   people because they were drug addicted, and the fact that they

20   were using drugs was the item, the pressure that was used by

21   primarily Mr. Summerlin to get them to cooperate and to do what

22   he wanted them to do.

23            Beginning in April of 2021, the FBI received

24   information that Mr. Summerlin was involved in forcing women to

25   operate a commercial sex trafficking operation out of his

1  basement.  This was the location on Berden Street in Detroit.

2  Mr. Summerlin's phone number had been tracked to some 100

3  different commercial sex advertisements involving different

4  females at that time period.

5          After gathering information by interviewing a large

6  number of these individuals, a search warrant was executed at

7  this residence on October 14th of 2021.  At the residence the

8  agents found cocaine, fentanyl and heroin.  They found a

9  shotgun, they found a scale, they found needles, they found a

10 cutting agent.  Perhaps most importantly, they found two adult

11 victims who were in the basement of the house.

12         In November of 2021, after Mr. Summerlin was in

13 custody in pretrial detention and could no longer have any

14 effect on Ms. Gilliam, he contacted her, asked her to, quote,

15 check in with one of the victims who's identified as Adult

16 Victim 6.  Ms. Gilliam began texting this adult victim and sent

17 her a text that could only be described as threatening texts,

18 indicating that she would be on her if she caught her and

19 called her curse words and indicated essentially that she was

20 possibly going to face consequences for cooperating with the

21 government if she did.

22         At that time Ms. Gilliam had denied full knowledge of

23 what was going on at the residence.  She had said that she

24 thought that the victims were there to clean the basement.

25 That was false.

1          The agents interviewed a number of the victims

2     including Adult Victims 1, 2, 3, 4, 5 and 6.  They indicated

3     that Mr. Summerlin was posting and controlled the

4     advertisements; that the money from the customers for the

5     commercial sex dates was given either to Mr. Summerlin or to

6     Ms. Gilliam; that Ms. Gilliam was present and aware of the

7     activity of the commercial sex trafficked individuals who were

8     in her home.

9          According to Adult Victim 1, Mr. Summerlin kept both

10    firearms and drugs at the home, and Ms. Gilliam was present

11    while some of these commercial sex dates were going on.

12         As well, some children were in the home at the time

13    when some of these commercial sex dates were going on.

14         According to Adult Victim No. 3, she met Mr.

15    Summerlin in October of 2019.  She bought drugs from him.  He

16    gave her more drugs than what she had paid for.  She got into

17    debt.  Mr. Summerlin forced her to have sex with him.  He

18    assaulted her.  She indicated that when she told Ms. Gilliam

19    about the fact that Mr. Summerlin had raped her, Ms. Gilliam

20    had responded by saying, well, then she should -- she, Ms.

21    Gilliam, should beat her for that, beat the victim.  Ms.

22    Gilliam allegedly, according to this victim, told the victim

23    how much they were making per day from these commercial sex

24    trafficking acts.

25         Adult Victim 3 was the person who actually overdosed

1   on drugs at that home.  She was brought back by the

2   administration of Narcan and found that both Mr. Summerlin and

3   Ms. Gilliam were standing over her at that time.

4         According to Adult Victim 4, she also bought drugs

5   from Mr. Summerlin.  She carried out dates at the address.  Mr.

6   Summerlin took away her phone and her keys.  The customers

7   would give the money either to Mr. Summerlin or to Ms. Gilliam.

8   And she was held against her will for months in that home.  She

9   indicated that Ms. Gilliam would do laundry in the basement

10  knowing they were there.  She eventually escaped running out

11  into the snow.

12        According to Adult Victim 5, she met Mr. Summerlin

13  herself through these personal ads.  She visited the home.  She

14  worked in the basement in exchange for drugs.  Again, the money

15  from the customers were given either to Mr. Summerlin or to Ms.

16  Gilliam.  She also escaped in January of 2021.  She was

17  homeless for a period of time and eventually came back.  Adult

18  Victim 5 was present when the previous adult victim overdosed,

19  and according to Adult Victim 5, the victim who had overdosed

20  was forced to go back into commercial sex acts the same day

21  that she recovered from the overdose.

22        The Court has listened very carefully to the victims'

23  statements in this case, and in particular our victim who

24  testified today to the abuse that she suffered, and that's what

25  this case is primarily about.  It's about the conduct of a

1    predator really who was willing to prey upon women who were

2    addicted to drugs and then make money off them by selling them

3    at his home.

4            There's no question that Mr. Summerlin is more

5    culpable in this crime than Ms. Gilliam is, but Ms. Gilliam is

6    also culpable.  She is responsible.  She was receiving the

7    money.  She was aware of the fact that this was going on in her

8    home.

9            As has been indicated, when the FBI executed the

10   search warrant, they found drugs on plates that were in an

11   upstairs bedroom.  There are photographs of this in the

12   government's sentencing memorandum that show the plates and the

13   drugs.  This was an extremely unsafe and inappropriate business

14   and crime to be conducting in a home where there were children

15   present.  It was very dangerous.

16           I also have to consider the background of the

17   individual person here.  Ms. Gilliam did have a difficult

18   upbringing as has been written into the Presentence Report.

19   She lost her brother who was actually murdered when she was

20   only a young girl.  According to the report, he was murdered in

21   1987 when she was seven years old.

22           I have noted, of course, and paid attention to the

23   fact that she has two children who are young, young adults I

24   would say — Mr. Poole who is 23, Ms. Rogers who is 17 and still

25   in high school — and that according to the letters that I have

1    received, they have seen their mother, Ms. Gilliam, to be a

2    good mother, to be someone who is taking care of them and has

3    tried to support them over the years.

4            The facts of this case show, however, that Ms.

5    Gilliam was exposing them to a very dangerous situation and

6    herself was involved in abusing and assisting Mr. Summerlin in

7    abusing these women.  That's what the facts are in this case.

8    Even though it's sad for children to hear such things about

9    their mother, that's what happened in this case.

10           I am concerned about the statements in the report

11   where Ms. Gilliam does indicate that she would go back to be

12   with Mr. Summerlin, that she would be willing to allow him to

13   come back into her home after he is released.  I have listened

14   to what defense counsel has said, that that is not true.  I

15   can't say for sure whether it's true or not.  Ms. Gilliam did

16   not address it.

17           I have also noticed, of course, and paid attention to

18   the fact that Ms. Gilliam has had some serious medical concerns

19   and conditions, including being diagnosed with cervical cancer

20   and having a hysterectomy and dealing with cancer treatment,

21   which is difficult and is part of what the Court has to take

22   into account.

23           I note as well that Ms. Gilliam has been a dedicated

24   employee.  She has worked at several positions effectively, and

25   that is to her credit to work regularly and to support her

1      family, those things are to her credit.

2             And so in determining what the sentence should be,

3      the Court has to take all of these different factors into

4      account.

5             In terms of the nature of the offense, I think I've

6      described already how serious it is and how dangerous it was

7      and how it resulted in the harmful consequences to these women

8      who were forced to engage in this activity by Mr. Summerlin,

9      and then who, even after Mr. Summerlin was arrested, had to

10     face the attempts by Ms. Gilliam to tamper with their

11     testimony, to threaten them with consequences if they

12     cooperated, making them even more victimized than they were

13     before, in order to help Mr. Summerlin.

14            It's clear from this report that Ms. Gilliam took

15     money from the sex customers when Mr. Summerlin was not there,

16     that she was aware of the drugs, she was aware of Mr.

17     Summerlin's violence to the women, she was aware they were

18     being held in the basement.

19            And so in terms of the seriousness of the offense,

20     the offense deserves a significant penalty, it deserves a

21     significant punishment.  It would not be appropriate to impose

22     a sentence with no incarceration here where you have guidelines

23     that are this high, where the actual guidelines are between 168

24     and 210 months, and even before the parties had calculated them

25     to be 108 months to 135 months, a sentence of no jail time is

1    not realistic here.

2         As I have said, part of what concerns me is

3    deterrence in the sense that even when Mr. Summerlin was in

4    custody, Ms. Gilliam tried to assist him by putting pressure on

5    the victims not to testify against him.  That shows judgment

6    that is more likely to get reinvolved in criminal activity and

7    it's the kind of judgment that concerns the Court a great deal

8    here.

9         I also listened when Ms. Mannarino said that Ms.

10   Gilliam has changed to some degree.  That over these three

11   years since the time when this happened, she has not continued

12   in any kind of criminal activity like that, that she has gone

13   through therapy, that she's learned from her mistakes.  And

14   that may be true, but that's only part of the question because

15   the Court must consider the need to impose a sentence that is a

16   just punishment, and that means that there has to be

17   consequences for criminal activity that harms individuals.

18        In this case there were some hundred victims.  There

19   were some five specific victims who have provided information

20   to the Court about the suffering that they went through because

21   of Ms. Gilliam's conduct.  That type of a crime needs to have a

22   significant punishment.  In order to promote respect for law

23   and provide for a just punishment, there has to be a custody

24   sentence here.

25        Mr. Summerlin himself was sentenced to 210 months.

1   That's 17 and a half years.  That sentence was the result of a

2   Plea Agreement that contained that sentence under what we call

3   a Rule 11(c)(1)(C) plea where the Court, if it accepted that

4   Plea Agreement, had to impose that sentence.  That sentence was

5   somewhat below the guideline range for Mr. Summerlin, which was

6   between 235 and 293 months.  I thought that that sentence was

7   still a fair and just sentence, although a higher sentence

8   might also have been fair and just given the nature of the

9   suffering that he caused.

10          Ms. Gilliam's situation is different for the reasons

11  that I've indicated here.  Her role was not as significant.

12  She was not the leader, she was not the manager.  I do think

13  that she was operating to some degree out of fear of Mr.

14  Summerlin, but I have to weigh that against her conduct after

15  he was locked up because she continued to try to help him and

16  to try to victimize the victims even after he was locked up.

17          So taking into account that she does have a lesser

18  role here and the fact that she has also, according to defense

19  counsel, gone through therapy in a way that has helped her to

20  make better decisions, I don't think that it's necessary that

21  she have a sentence within the guideline range, which, as I

22  have indicated, is between 168 and 210 months.  The government

23  is recommending a sentence of 108 months, which is nine years.

24  Nine years is just a little greater than half of the sentence

25  that Mr. Summerlin received.

1          I think there's some need here to protect the public

2     because I think Ms. Gilliam's judgment has continually placed

3     her in these situations where she harms others.  I don't think

4     it's as great as it was before, but I think there is a need to

5     protect the public here.

6          This kind of a case shows to me that at the time it

7     was going on, the two main defendants did not respect the women

8     that they were trafficking.  They thought of them as less than

9     human.  They thought it was okay to treat them as objects to be

10    sold.  I think that's what led to this offense.

11         Consequently, I'm going to impose a sentence that is

12    slightly below what the government has asked for here.  I think

13    that a sentence of eight years would be sufficient and not

14    greater than necessary.  That would be a sentence of 96 months.

15    That is the sentence that I intend to impose.  Before I do so,

16    I want to ask the parties if they have any objections.

17         MS. HINDELANG:  No, Your Honor.

18         MS. MANNARINO:  Nothing further than those already

19    stated, Judge.  Thank you.

20         THE COURT:  Then pursuant to the Sentencing Reform

21    Act of 1984, the Court, considering the sentencing guidelines

22    and factors contained in 18 U.S. Code Section 3553(a), hereby

23    commits the defendant to the custody of the U.S. Bureau of

24    Prisons for a term of 96 months on Count 1 of the Second

25    Superseding Indictment.

1          On Count 10 of the Second Superseding Indictment,

2     also pursuant to the Sentencing Reform Act of 1984, the Court,

3     considering those same guidelines and factors, hereby commits

4     the defendant to the custody of the U.S. Bureau of Prisons also

5     for a term of 96 months to be served concurrently with Count 1.

6          Upon release from imprisonment, the defendant shall

7     be placed on supervised release for a period of five years on

8     Count 1 and two years on Count 10 to be served concurrently.

9          It is further ordered the defendant shall pay a

10    special assessment of $200 which will be due immediately.

11         It is further ordered the defendant will pay a

12    Justice for Victims of Trafficking Act assessment of $5,000

13    which will be due immediately.

14         While in custody the defendant shall participate in

15    the Inmate Financial Responsibility Program.  The Court's aware

16    of the nature of this program and approves of the payment

17    schedules and orders the defendant's compliance.

18         The Court waives the imposition of a fine, costs of

19    incarceration, costs of supervision due to the defendant's lack

20    of financial resources and potential restitution obligation.

21         Mandatory drug testing is ordered.

22         Pursuant to Title 34, U.S. Code, Section 4702, the

23    defendant shall cooperate with the collection of a DNA sample

24    as directed by the probation officer.

25         While on supervision, the defendant shall abide by

1   the standard conditions as adopted by the U.S. District Court

2   for the Eastern District of Michigan and shall comply with the

3   following special conditions:

4           Number one, you must submit to substance abuse

5   testing to determine if you have used a prohibited substance.

6           Number two, you must successfully complete any trauma

7   assessment evaluations as directed by the probation officer.

8   You must participate in a Trauma-Focused Cognitive Behavioral

9   program and/or a Moral Reconation Therapy program and follow

10  the rules and regulations of that program should the

11  assessments or evaluations deem it to be necessary.  The

12  probation officer will supervise your -- your participation in

13  this program.

14          Number three, you must successfully complete any sex

15  offender diagnostic evaluations, treatments or counseling

16  programs as directed by the probation officer.  Reports

17  pertaining to sex offender assessments again shall be provided

18  to the probation officer.  Based on your ability to pay, you

19  shall pay the costs of such diagnostic evaluations in an amount

20  to be determined by your probation officer.

21          You must participate in the cognitive -- excuse me,

22  in the Computer/Internet Monitoring Program administered by the

23  U.S. Probation Department.  You must abide by that program that

24  is in effect at the time of your supervision and comply with

25  any amendments to the program during the time of supervision.

1   Due to any advances in technology that may occur, the Court

2   will adopt amendments to this monitoring program as necessary.

3          For the purposes of accounting for all computers and

4   hardware and software, you must submit your person, residence,

5   computer and/or vehicle to a search conducted by a U.S.

6   Probation Department officer at a reasonable time and a

7   reasonable manner.  You shall inform any other residents where

8   you are living that the premises may be subject to a search

9   pursuant to this condition.  You shall provide the probation

10  officer with access to any requested financial information

11  including billing records.

12         Number five, you must submit your person, residence,

13  office, vehicles, papers, business or place of employment and

14  any property under your control to a search.  Such a search

15  shall be conducted by a U.S. probation officer at a reasonable

16  time and in a reasonable manner based upon reasonable suspicion

17  of contraband or evidence of a violation of a condition of

18  release.  Failure to submit to such a search may be grounds for

19  revocation.  You must warn any residents that the premises

20  where you are may be subject to such a search.

21         Number six, you must not have any contact, directly

22  or indirectly, with any victim or witness in this offense

23  unless approved by the probation officer.

24         Number seven, you must submit to periodic polygraph

25  testing at the discretion of the probation officer as a means

1    to ensure your compliance with the requirements of supervision

2    or treatment.  No violation proceedings shall arise solely on

3    the results of a polygraph examination.  Based on your ability

4    to pay, you shall pay the cost of any polygraph examination in

5    an amount determined by the probation officer.

6              We have a number of counts in the Second Superseding

7    Indictment that I believe need to be dismissed.  Does the

8    government wish to make a motion?

9              MS. HINDELANG:  Yes, Your Honor.  I'd move to dismiss

10   Counts 2, 6, 7 and 8 of the Second Superseding Indictment.

11             THE COURT:  Counts 2, 6, 7 and 8 of the Second

12   Superseding Indictment are hereby dismissed.

13             That is the sentence of the Court.  Does either party

14   wish to place any objections on the record to the sentence as

15   rendered in open court?

16             MS. HINDELANG:  No, Your Honor.

17             MS. MANNARINO:  Nothing further.

18             THE COURT:  So Ms. Gilliam, in your Plea Agreement

19   there was a provision regarding your right to appeal and that

20   was in paragraph 12.  And it said that you were giving up your

21   right to appeal your conviction, and that as long as the

22   sentence of imprisonment did not exceed the top of the

23   guideline range determined by the Court, that you were giving

24   up your right to appeal your sentence.

25             Now, for some reason if you believe that you do have

```
 1    an appellate error that you wish to bring to the attention of
 2    the Court of Appeals, you would need to do that within 14 days
 3    of the date that the written Judgment is issued.  Do you
 4    understand that deadline?
 5              DEFENDANT GILLIAM:  Yes, Your Honor.
 6              THE COURT:  Now, I understand that Ms. Gilliam is
 7    currently on bond.  Is there any reason that bond should not
 8    continue?
 9              MS. HINDELANG:  No, Your Honor.
10              THE COURT:  Is there anything else on behalf of the
11    defendant that you would like to raise, Ms. Mannarino?
12              MS. MANNARINO:  No.  And thank you for continuing the
13    bond.  I will at some point be requesting that any custodial
14    sentence begin after June.  I don't know if the Court wants in
15    a written motion my reasons for that.
16              THE COURT:  What's -- do you know the reason for it
17    now?
18              MS. MANNARINO:  I do.
19              THE COURT:  What?
20              MS. MANNARINO:  It has to do with her daughter's
21    graduation from high school.
22              THE COURT:  Mm-hmm.  What's the government's
23    position?
24              MS. HINDELANG:  Your Honor, I just -- I don't know
25    that we can state a position without a little bit more
```

1    information, so I guess I would appreciate being able to brief

2    the issue.  I don't know that we'll have an objection, but I

3    would just like all of the information before taking a stance.

4          THE COURT:  Well, so normally what happens is the

5    Bureau of Prisons will notify you, Ms. Gilliam, as to when

6    you're supposed to report to serve this sentence, and you're

7    supposed to appear at the designated facility.  Sometimes that

8    can be put off if there's a good reason for it.  And so I will

9    take into account any such request to temporarily postpone the

10   reporting date for the reason that Ms. Mannarino has suggested.

11   I don't think that it's a particularly unreasonable request but

12   I'll wait until I see.

13         MS. MANNARINO:  Thank you.

14         THE COURT:  All right.  Is there anything further we

15   need to address?

16         MS. HINDELANG:  No, thank you.

17         THE COURT:  Then we can be adjourned in this matter.

18         THE CLERK:  All rise.  Court is in recess.

19         (Court in recess at 12:17 p.m.)

20                        —  —  —

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2           I, Linda M. Cavanagh, Official Court Reporter of the

 3    United States District Court, Eastern District of Michigan,

 4    appointed pursuant to the provisions of Title 28, United States

 5    Code, Section 753, do hereby certify that the foregoing pages 1

 6    through 40 comprise a full, true and correct transcript taken

 7    in the matter of United States of America vs. D-2 Samantha

 8    Gilliam, Case No. 21-20665, on Thursday, November 21, 2024.

 9

10                           s/Linda M. Cavanagh
                             Linda M. Cavanagh, CRR, RMR, RDR, CRC
11                           Federal Official Court Reporter
                             United States District Court
12                           Eastern District of Michigan

13

14

15

16

17    Date: January 27, 2025
      Detroit, Michigan
18

19

20

21

22

23

24

25
```